# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

GENERAL MOTORS LLC,

                          Plaintiff,

v.

NIPPON YUSEN KABUSHIKI KAISHA; NYK
LINE (NORTH AMERICA) INC.; WALLENIUS
WILHELMSEN LOGISTICS AS; WALLENIUS
WILHELMSEN LOGISTICS AMERICAS LLC;
EUKOR CAR CARRIERS INC.

                          Defendants.

**COMPLAINT FOR DAMAGES**

**(1)  VIOLATION OF THE
SHERMAN ACT PURSUANT TO 15
U.S.C. § 1**

**(2)  VIOLATION OF THE
DONNELLY ACT PURSUANT TO
N.Y. GEN. BUS. LAW §§ 340**

**(3)  BREACH OF CONTRACT**

**(4)  UNJUST ENRICHMENT**

**DEMAND FOR JURY TRIAL**

Plaintiff General Motors LLC ("GM") brings this action for damages against all

Defendants named herein and hereby alleges as follows:

## I.  NATURE OF ACTION

1.      Defendants and their co-conspirators are the largest providers of deep sea vehicle

transport services ("Vehicle Carrier Services," described more fully below) in the world.  From

at least February 1, 1997 through at least September 31, 2012 (the "Conspiracy Period"), the

exact start and end date of the conspiracy unknown to GM at this time, Defendants and their co-

conspirators secretly conspired to overcharge their customers for Vehicle Carrier Services.  They

conspired to rig bids, allocate markets, restrain capacity, and to otherwise fix, raise, stabilize, and

maintain prices for Vehicle Carrier Services for shipments to and from the United States and

elsewhere in the world.  Pursuant to this conspiracy to rig bids, allocate markets, restrain

capacity, and to otherwise fix, raise, maintain, and stabilize prices, Defendants and their co-

conspirators engaged in a series of integrated and overlapping anticompetitive acts.  For nearly

two decades, this conspiracy affected the market for all Vehicle Carrier Services.  GM paid

higher prices for Vehicle Carrier Services than it would have paid in a competitive market as a direct result of Defendants' and their co-conspirators' unlawful conduct.

2.      Competition authorities across the globe, including in the United States, European Union, Canada, Japan, and Chile, have been actively investigating—and continue to investigate—Defendants' and their co-conspirators' illegal conduct with respect to Vehicle Carrier Services.  Several Defendants and co-conspirators have already confessed to their role in this conspiracy.  In the United States, the amnesty applicant has been cooperating with the U.S. Department of Justice ("DOJ") after seeking amnesty for participating in this cartel.  In addition, Defendant NYK Line and co-conspirators CSAV and "K" Line (all defined below) have all pleaded guilty to violating the antitrust laws for conspiring to suppress and eliminate competition by allocating routes, rigging bids, and fixing prices for Vehicle Carrier Services to and from the United States.  So far, the Defendants and their co-conspirators have paid over $136 million in criminal fines in the United States alone.  Many of the Defendants and their co-conspirators have also been fined by the Japanese and Chilean competition authorities.  None of these fines have compensated the victims of their illegal activities, including GM.

3.      By entering into contracts with GM to provide GM with Vehicle Carrier Services, Defendants and their co-conspirators:  (1) agreed to comply with all applicable laws in the countries where services are provided; (2) represented that they would not engage in corrupt business practices in providing Vehicle Carrier Services; (3) agreed not to disclose confidential information to competitors; and (4) agreed to provide Vehicle Carrier Services to GM in an economic manner.  The Defendants, by engaging in the anticompetitive conduct alleged herein, and/or by providing GM with Vehicle Carrier Services at prices inflated by that conduct, violated those terms.

4.      GM is a United States company that, during the Conspiracy Period, purchased hundreds of millions of dollars of Vehicle Carrier Services directly from providers of Vehicle Carrier Services, including Defendants and their co-conspirators, for the transportation of new assembled motor vehicles to and from ports in the United States and elsewhere in the world.

During the Conspiracy Period, GM also negotiated and entered into contracts for tens of millions of dollars of Vehicle Carrier Services with providers of Vehicle Carrier Services, including Defendants and their co-conspirators, for the transportation of new assembled motor vehicles to and from ports in the United States and elsewhere in the world, that are still in effect after the end of the Conspiracy Period.  As a direct, substantial, and reasonably foreseeable result of Defendants' and their co-conspirators' unlawful conduct and conspiracy to allocate markets, rig bids, restrain capacity, and to otherwise fix, raise, maintain, and stabilize the prices of Vehicle Carrier Services, the prices of Vehicle Carrier Services purchased by GM were artificially inflated.  Thus, GM suffered damages as a result of Defendants' and their co-conspirators' conspiracy and brings this action to recover the overcharges paid for Vehicle Carrier Services it purchased during the Conspiracy Period, as well as any lingering effects of the conspiratorial conduct alleged herein.

5.      GM brings this action to recover treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for Defendants' and their co-conspirators' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Additionally, GM seeks to recover the costs of suit, including reasonable attorneys' fees, for the injuries that GM suffered as a result of Defendants' and their co-conspirators' conspiracy to allocate markets, rig bids, restrain capacity, and to otherwise fix, raise, maintain, and stabilize the prices of Vehicle Carrier Services in violation of the federal antitrust laws.

6.      GM also brings this action pursuant to the Donnelly Act, New York General Business Law §§ 340, *et seq.*, for damages that GM sustained due to Defendants' and their co-conspirators' violation of New York General Business Law § 340(1).  Furthermore, GM seeks to recover costs and reasonable attorneys' fees for the injuries that GM suffered as a result of the Defendants' and their co-conspirators' conspiracy to allocate markets, rig bids, restrain capacity, and to otherwise fix, raise, maintain, and stabilize the prices of Vehicle Carrier Services in violation of the antitrust laws of the state of New York.

7.      GM brings its claims for breach of contract under the laws of the state of New York relating to each and every contract GM entered into with the Defendants during the Conspiracy Period.

8.      GM brings its claims for unjust enrichment under the laws of the state of New York.

## II.    JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over GM's Sherman Act and Clayton Act claims, pursuant to 28 U.S.C. §§ 1331 and 1337.

10.     Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over GM's claims under the Donnelly Act, as well as its claims for breach of contract and unjust enrichment under New York law.  These state law claims are so related to GM's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act that they form part of the same case or controversy.

11.     The Defendants and their co-conspirators engaged in conduct both in the United States and elsewhere in the world that caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.  The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States.  The Defendants' and their co-conspirators' Vehicle Carrier Services are sold in the flow of interstate commerce.

12.     The activities of Defendants and their co-conspirators, as described herein, involved United States import trade or import commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce.  Defendants' illegal conduct involved United States import trade or import commerce, particularly insofar that Defendants and their co-conspirators transported Vehicles (defined below) for importation to the United States.  Defendants' and their co-conspirators' conspiracy also directly and substantially affected the price of Vehicle Carrier Services purchased by GM in the United States for the transport of GM Vehicles to and from

4

ports in the United States and elsewhere in the world.  In particular, Defendants' and their co-conspirators' conspiracy directly and adversely affected the prices of Vehicle Carrier Services that GM purchased in the United States.  These effects give rise to GM's antitrust claims.

13.     This Court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act, 15 U.S.C. § 22.  Defendants and their co-conspirators purposefully availed themselves of the laws of the United States.  At least one Defendant or co-conspirator maintained its principal place of business in New York during the Conspiracy Period.  Each Defendant conducts substantial business in New York.  In addition, Defendants and their co-conspirators purposefully availed themselves of the laws of the United States and New York, particularly insofar as they provided Vehicle Carrier Services to customers at ports in the United States and New York.  Indeed, the Port of New York and New Jersey is the largest port in the United States for Vehicle imports and exports.  In fact, a substantial number of the Vehicles exported from, and imported to, the United States, by GM, were transported by Defendants and their co-conspirators through the Port of New York and New Jersey.  Defendants' and their co-conspirators' conspiracy affected this commerce in Vehicle Carrier Services in the United States and New York.  Accordingly, each of the Defendants maintains minimum contacts with this District more than sufficient to subject it to service of process and sufficient to comply with due process of law.

14.     Further, GM and Defendants and their co-conspirators agreed that New York law would govern the service contracts GM entered into with Defendants and their co-conspirators for the purchase of Vehicle Carrier Services.

15.     The anticompetitive agreements alleged in this Complaint were not filed by Defendants and their co-conspirators with the Federal Maritime Commission ("FMC").  Accordingly, the Shipping Act of 1984, 46 U.S.C. §§ 40101, *et seq.*, ("Shipping Act") does not immunize these agreements from the reach of the federal antitrust laws.  The Shipping Act specifically enumerates conduct that is prohibited by the Act, and thus over which the Shipping Act governs.  However, to the extent that the agreements alleged herein relate to conduct that is

not enumerated as "prohibited" conduct in the Shipping Act, such agreements are outside the scope of that Act.

16.     The service contracts that govern GM's purchase of Vehicle Carrier Services from Defendants and their co-conspirators pertain to new assembled motor vehicles. Accordingly, pursuant to 46 U.S.C. § 40502(b)(2), these contracts need not be filed with the FMC.  As a result, claims relating to or arising from these contracts are outside the scope of the Shipping Act and the jurisdiction of the FMC.  Such claims are instead within the jurisdiction of this Court.

17.     Venue is proper in the Eastern District of New York pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to this claim occurred in this district.  GM and Defendants and their co-conspirators selected the New York federal courts to resolve any disputes arising under or relating to the service contracts GM entered into with Defendants and their co-conspirators for the purchase of Vehicle Carrier Services.

## III.    **THE PARTIES**

### A.  **Plaintiff**

18.     Plaintiff General Motors LLC ("GM") is a Delaware limited liability company with its principal place of business at 300 Renaissance Center in Detroit, Michigan.  General Motors LLC is one of the world's largest automobile original equipment manufacturers ("OEM"), manufacturing new assembled cars, trucks, and other motor vehicles through brands such as Chevrolet, Buick, GMC, Cadillac, Baojun, Holden, Isuzu, Jiefang, Opel, Vauxhall, and Wuling.  In July 2009, General Motors LLC acquired all the claims, unless specifically excluded, of the former General Motors Corporation, which was then known as Motors Liquidation Company.

19.     During the Conspiracy Period, therefore, GM either purchased Vehicle Carrier Services sold by providers of Vehicle Carrier Services, including Defendants and their co-conspirators, or acquired the claims held by the former General Motors Corporation with respect to the claims advanced in this complaint.  As a direct result of Defendants' and their co-conspirators' conspiracy, GM has been injured in its business and property because that conspiracy artificially inflated the prices it paid for Vehicle Carrier Services during the Conspiracy Period.

20.     During the Conspiracy Period, GM negotiated and entered into contracts for Vehicle Carrier Services to and from the United States and elsewhere in the world.  These negotiations and procurement decisions were conducted or made in the United States, including in the Detroit, Michigan, area.

**B.  Defendants**

**1.  NYK Line Defendants**

21.     Defendant Nippon Yusen Kabushiki Kaisha ("NYK Japan") is a Japanese company with its principal place of business at 3-2, Marunouchi 2 Chome, Chiyoda-Ku, Tokyo, 100-0005, Japan.  NYK Japan has subsidiaries acting as its agents in the United States, including in Secaucus, New Jersey.  NYK Japan, directly and/or through its subsidiaries and joint ventures, which it wholly owned and/or controlled, shipped Vehicles into the United States, including to and from this District, during the Conspiracy Period.  NYK Japan, directly and/or through its subsidiaries and joint ventures, which it wholly owned and/or controlled, also provided, marketed and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Conspiracy Period.

22.     Defendant NYK Line (North America) Inc. ("NYK America") is a wholly-owned subsidiary of NYK Japan, with its principal place of business at 300 Lighting Way, 5th Floor, Secaucus, New Jersey 07094.  NYK America acts as Defendant NYK Japan's agent in the United States.  At all times during the Conspiracy Period, NYK America's activities in the

United States were under the control and direction of NYK Japan, which controlled its policies, sales, and finances.

23.     NYK Japan and NYK America (collectively, "NYK Line"), directly or through their wholly-owned and/or controlled subsidiaries, provided, marketed, and sold Vehicle Carrier Services for shipments to and from the United States, including in this District.

### 2. **WWL Defendants**

24.     Defendant Wallenius Wilhelmsen Logistics AS ("WWL Norway") is a Norwegian company with its principal place of business at Strandveien 12, 1366 Lysaker, Norway.  WWL Norway is a joint venture between Wallenius Lines AB and Wilh. Wilhelmsen ASA, and operates most of those companies' vessels.  WWL Norway is the contracting party in customer contracts for Vehicle Carrier Services, including those with GM.  Defendant Wallenius Wilhelmsen Logistics Americas LLC ("WWL America") is a wholly-owned subsidiary of WWL Norway, with its principal place of business at 188 Broadway, Woodcliff Lake, New Jersey 07677.  WWL America acts as Defendant WWL Norway's agent in the United States.  At all times during the Conspiracy Period, WWL America's activities in the United States were under the control and direction of WWL Norway, which controlled its policies, sales, and finances.  During the Conspiracy Period, WWL Norway and WWL America (collectively, "WWL"), directly or through their wholly-owned and/or controlled subsidiaries, provided, marketed, and sold Vehicle Carrier Services for shipments to and from the United States, including in this District.

### 3. **EUKOR**

25.     Defendant EUKOR Car Carriers Inc. ("EUKOR") is a South Korean company with its principal place of business at 152 Teheran-ro, Gangnam-gu, Seoul, South Korea, 135-984.  EUKOR is a joint venture: Wallenius Lines AB owns 40 percent, Wilh. Wilhelmsen ASA owns 40 percent, and Hyundai Motor Company and Kia Motors Corporation own 20 percent.  EUKOR has offices throughout the United States, including at Bridge Plaza North #430, Fort Lee, New Jersey 07024.  During the Conspiracy Period, EUKOR, directly or through its wholly-

owned subsidiaries, provided, marketed, and sold Vehicle Carrier Services for shipments to and from the United States, including in this District.

C. **Co-conspirators and Agents**

26.     Co-conspirator Höegh Autoliners Holdings AS ("HAL Holdings") is a Norwegian company with its principal place of business in Oslo, Norway.  Co-conspirator Höegh Autoliners AS ("HAL AS") is a wholly-owned subsidiary of HAL Holdings with its principal place of business at Drammensveien 134, Skøyen, Oslo, 0212, Norway.  Co-conspirator AUTOTRANS AS ("AUTOTRANS") is a wholly-owned subsidiary of HAL Holdings with its principal place of business at 177 Av. des Grésillons, 92230 Gennevilliers, France.  Co-conspirator Höegh Autoliners, Inc. ("HAL Inc.") is a wholly-owned subsidiary of HAL AS with its principal place of business at 2615 Port Industrial Drive, Jacksonville, Florida 32226.  During the Conspiracy Period, HAL Inc.'s principal place of business was located at 50 Jericho Quadrangle, Suite 210, Jericho, New York.  Co-conspirator Alliance Navigation LLC ("Alliance") is a wholly-owned affiliate of HAL Inc. with its principal place of business at 2615 Port Industrial Drive, Jacksonville, Florida 32226.  During the Conspiracy Period, HAL Holdings, HAL AS, AUTOTRANS, HAL Inc., and Alliance (collectively, "Höegh"), directly or through their wholly-owned and/or controlled subsidiaries, provided, marketed, and sold Vehicle Carrier Services for shipments to and from the United States, including in this District.

27.     Co-conspirator Compañía Sud Americana de Vapores S.A. ("CSAV Chile") is a Chilean company with its principal place of business at Calle Sotomayor 50, Valparaiso, Chile.  Co-conspirator CSAV Agency North America, LLC ("CSAV America") is a wholly-owned subsidiary of CSAV Chile, with its principal place of business located at 99 Wood Avenue South, 9th Floor, Iselin, New Jersey 08830.  CSAV America acts as co-conspirator CSAV Chile's agent in the United States.  At all times during the Conspiracy Period, CSAV America's activities in the United States were under the control and direction of CSAV Chile, which controlled its policies, sales, and finances.  During the Conspiracy Period, CSAV Chile and CSAV America (collectively, "CSAV"), directly or through their wholly-owned and/or

controlled subsidiaries, provided, marketed, and sold Vehicle Carrier Services for shipments to and from the United States, including this District.

28.     Co-conspirator Kawasaki Kisen Kaisha, Ltd. ("'K' Line Japan") is a Japanese company with its principal place of business at 1-1, Uchisaiwaicho 2-chome, Chiyoda-ku, Tokyo 100-8540, Japan.  Co-conspirator "K" Line America, Inc. ("'K' Line America") is a wholly-owned subsidiary of "K" Line Japan with its principal place of business at 8730 Stony Point Parkway, Richmond, Virginia 23235.  "K" Line America acts as co-conspirator "K" Line Japan's agent in the United States.  At all times during the Conspiracy Period, "K" Line America's activities in the United States were under the control and direction of "K" Line Japan, which controlled its policies, sales, and finances.  During the Conspiracy Period, "K" Line Japan and "K" Line America (collectively, "'K' Line"), directly or through their wholly-owned and/or controlled subsidiaries, provided, marketed, and sold Vehicle Carrier Services for shipments to and from the United States, including in this District.

29.     Co-conspirator Mitsui O.S.K. Lines, Ltd. ("MOL Japan") is a Japanese company with its principal place of business at 1-1 Toranomon 2-chome, Minato-ku, Tokyo, 105-8688, Japan.  Co-conspirator Mitsui O.S.K. Bulk Shipping (USA), Inc. ("MOBUSA") is a wholly-owned subsidiary of MOL Japan, incorporated in New Jersey, with its principal place of business at Harborside Financial Center, Plaza Five, Suite 1710, Jersey City, New Jersey 07311.  Co-conspirator World Logistics Service (U.S.A.), Inc. ("WLS") is a wholly-owned subsidiary of MOL Japan, with its principal place of business at 111 West Ocean Blvd., Suite 1040, Long Beach, California 90802.  Co-conspirator Nissan Motor Car Carrier Co., Ltd. ("NMCC") is a Japanese company with its principal place of business at 1-2-2 Uchisaiwai-cho, Chiyoda-ku, Tokyo 100-0011, Japan.  NMCC is a joint venture.  Since 2009, MOL Japan owns 70 percent, co-conspirator Höegh owns 20 percent, and Nissan Motor Co., Ltd. owns 10 percent.  From 1998 to 2009, MOL Japan owned 40 percent and Nissan Motor Co., Ltd. owned 60 percent.  At all times during the Conspiracy Period, NMCC's activities in the United States were under the control and direction of MOL Japan, which controlled its policies, sales, and finances.  During

the Conspiracy Period, MOL Japan, MOBUSA, WLS, and NMCC (collectively, "MOL"), directly or through their wholly-owned and/or controlled subsidiaries, provided, marketed, and sold Vehicle Carrier Services for shipments to and from the United States, including in this District.

30.     Various other individuals, persons, partnerships, sole proprietors, firms, corporations, and entities, some identified and some not yet identified, participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.  GM reserves the right to name some or all of these individuals, firms, and corporations as Defendants.  When GM establishes the identities of such co-conspirators, GM will seek leave to amend this complaint to add such co-conspirators as Defendants.  These other co-conspirators are believed to include, without limitation, Cido Car Carrier Services Ltd. ("Cido"), Glovis Co., Ltd., Grimaldi Compagnia di Navigazione, Compañía Chilena de Navegación Interoceánica, Toru Otoda, Hiroshige Tanioka, and Takashi Yamaguchi of co-conspirator "K" Line, and Susumu Tanaka of Defendant NYK Line.

31.     Whenever reference is made in this Complaint to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

32.     Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein. Each Defendant that is a subsidiary or affiliate of a foreign parent acts as the United States agent for Vehicle Carrier Services provided by its parent company.

IV.    **THE MARKET FOR VEHICLE CARRIER SERVICES**

33.     Vehicle Carrier Services involve transporting any type of wheeled freight on large, ocean-shipping vessels on deep-sea routes.  New assembled cars, trucks, and other motor vehicles ("Vehicles") are the majority of the freight shipped using Vehicle Carrier Services.  The

freight shipped also includes construction vehicles, tracked vehicles and machines (such as excavators or bulldozers), tractors, trailers, capital equipment vehicles used in construction, agriculture, and mining, and other types of wheeled freight.  During the Conspiracy Period, GM shipped Vehicles—including new assembled cars and trucks—using Vehicle Carrier Services.

34.     The conduct at issue relates to deep sea services.  Deep sea services transport Vehicles between continents; short sea services transport equipment over shorter distances and can enter smaller ports.  Routes for deep sea services tend to be organized along a line, with vessels sailing in a rotation and visiting a sequence of ports.

35.     Vehicle Carrier Services involve the use of specialized vessels equipped with ramps such that wheeled freight can be rolled on or rolled off of the vessels, as opposed to other types of cargo ships that typically use cranes to load and unload cargo.  The term "RoRo" is often used to refer to these vessels ("RoRo Vessels") or to the transport of vehicles on such vessels ("RoRo Shipping").  As used herein, "Vehicle Carrier Services" refers to the paid ocean transportation of Vehicles by RoRo.

36.     There are two types of RoRo Vessels:  (1) Pure Car Carriers, which are designed exclusively for the movement of passenger cars (and possibly small trucks) and have a fixed layout; and (2) Pure Car and Truck Carriers, which are designed to carry cars and trucks and equipped with hydraulics that can move the decks within the RoRo Vessel to enable the vessel to carry vehicles of varying sizes.  Due to its size and design, a single RoRo Vessel is typically capable of carrying many thousands of Vehicles at a time.

37.     There are no reasonable substitutes from Vehicle Carrier Services for shipping Vehicles over deep seas.

38.     GM arranges for the international ocean transportation of its Vehicles, and purchases such services directly from providers of Vehicle Carrier Services, including Defendants and their co-conspirators (or from any current or former subsidiary or affiliate of any Defendant or co-conspirator), for shipping Vehicles to and from the United States and elsewhere in the world.

## V.     DEFENDANTS' AND THEIR CO-CONSPIRATORS' ANTICOMPETITIVE CONDUCT

39.     Since at least 1997, Defendants and their co-conspirators have engaged in a continuous and wide-ranging conspiracy to restrain competition for the sale of Vehicle Carrier Services.  Defendants and their co-conspirators have conspired to rig bids and fix prices for Vehicle Carrier Services and restrict the supply of Vehicle Carrier Services.  Defendants' and their co-conspirators' conspiracy has resulted in higher prices of Vehicle Carrier Services for shipments to and from the United States and elsewhere in the world.  Indeed, this pervasive and global conspiracy forced GM to pay supracompetitive prices for the Vehicle Carrier Services it purchased.

40.     Because Defendants' and their co-conspirators' conspiracy was secret in nature, and because Defendants and their co-conspirators took steps to conceal their anticompetitive agreements, GM cannot yet know all the ways that Defendants and their co-conspirators conspired.  On information and belief, GM alleges that Defendants and their co-conspirators engaged in acts in furtherance of their conspiracy in addition to those specifically alleged in this Complaint, and that such additional acts also restrained trade in the sale of Vehicle Carrier Services for shipments to and from the United States and elsewhere in the world.

41.     Defendants and their co-conspirators do not have immunity from the antitrust laws for the anticompetitive conduct alleged herein.  Although certain Defendants and their co-conspirators may have filed some agreements with the FMC, they took advantage of legitimate discussions related to those agreements to enter into anticompetitive agreements for which they have no immunity under the Shipping Act.  Defendants and their co-conspirators used these sometimes daily communications to discuss and collude with respect to their customers' Vehicle Carrier Services contracts.

42.     The anticompetitive conduct was facilitated by executives, including high-ranking executives and executives with pricing and bidding authority at each of the Defendants and their co-conspirators.

43.     These executives had regular, often daily, conversations with each other regarding each carrier's business, shipping volumes, bids, and other sensitive customer information. Whenever an executive left his position, he would explain to his successor about the importance of, and need to continue, regular contact with competitors.  As a result, the new executives would continue these contacts with competitors to discuss competitively sensitive information and agree to further the ends of the conspiracy.

A. **Defendants and their Co-Conspirators Agreed to Rig Bids for Vehicle Carrier Services**

44.     Defendants and their co-conspirators frequently met or otherwise communicated regarding bids for Vehicle Carrier Services, and agreed to rig bids for Vehicle Carrier Services submitted to their customers, including GM.  These rigged bids were submitted in response to a customer's request for quotation.

45.     Such acts directly targeted GM.  Defendants and their co-conspirators rigged bids on GM tenders during the Conspiracy period.  Indeed, to implement at least some of these agreements, Defendants and their co-conspirators exchanged among themselves information regarding bids for customer business, which included confidential GM information such as negotiations, rates, and/or charges.

46.     In the Vehicle Carrier Services industry, the term "respect" refers to bid-rigging agreements, which include refraining from bidding for Vehicle Carrier Services, submitting intentionally high bids for Vehicle Carrier Services, or offering Vehicle Carrier Services with terms or conditions that made the offer less attractive.

47.     Defendants' and their co-conspirators' longstanding practice in the Vehicle Carrier Services industry was to rig bids by "respecting" each conspirator's incumbent business, for all customers and routes in the United States and elsewhere during the Conspiracy Period.

48.     The bid-rigging permeated the Vehicle Carrier Services industry, and affected GM tenders during the Conspiracy Period.  When GM issued a tender for Vehicle Carrier Services, Defendants and their co-conspirators would discuss and agree that the incumbent

would retain the business.  They often agreed on what prices each should bid for GM's Vehicle Carrier Services business, in an attempt to insure that the incumbent won the business.

49.     Some limited examples of these bid-rigging agreements for Vehicle Carrier Services include, *inter alia*:

    a.     According to the Chilean antitrust authorities, from at least 2000 through at least 2012, NYK Line agreed to "respect" CSAV's Vehicle Carrier Services business for GM for routes between the United States and Chile.

    b.     In 2001 or 2002, GM issued a tender for Vehicle Carrier Services business to Japan.  MOL asked WWL to "respect" the MOL business.  WWL agreed to "respect" MOL's business with GM to Japan.

    c.     In 2002, executives from NYK Line and MOL agreed that NYK Line would bid higher than MOL for GM Vehicle Carrier Services business from the United States to Japan.  MOL provided NYK Line the amount MOL was planning to bid, and NYK Line agreed to bid higher than that amount.

50.     The following are additional examples of Defendants' and their co-conspirators' agreements not to compete for OEM customers in Vehicle Carrier Services by rigging bids or allocating markets for Vehicle Carrier Services:

    a.     In 2001, MOL and Höegh agreed to allocate the transportation of vehicles from the United States to the Middle East.  MOL was not the incumbent and wanted this business.  Executives, including from MOL and Höegh, discussed and agreed that Höegh would not bid in exchange for MOL agreeing to use Höegh RoRo Vessels on the route if it won the business.  MOL won the business and then used Höegh's RoRo Vessels, as agreed.

    b.     From at least 2001 to at least 2009, NYK Line agreed to "respect" CSAV's Vehicle Services business with an OEM customer for routes between the United States and Chile.  CSAV, from at least 2011 to at least 2012, agreed to "respect"

NYK Line's Vehicle Services business for that same OEM customer on those same routes.

c.  From at least 2001 to at least 2012, NYK Line agreed to "respect" CSAV's Vehicle Carrier Services business for another OEM customer for routes between the United States and Chile.

d.  In 2002 or 2003, MOL, WWL, and Höegh agreed to rig the bid to an OEM customer for Vehicle Carrier Services.  After the customer issued a tender for transporting its vehicles from Europe to the United States, executives from MOL approached executives from WWL about the customer's business from Thailand to Europe.  WWL was the incumbent on the route from Europe to the United States, and MOL wanted to obtain the business from Thailand to Europe.  MOL and WWL agreed that MOL would not compete for WWL's route from Europe to the United States, and in exchange, WWL would not compete with MOL in MOL's attempt to obtain the Thailand to Europe business.  In furtherance of this agreement, WWL gave MOL a price to bid as part of the tender for Europe to the United States.  Similarly, MOL and Höegh agreed that Höegh would not compete with MOL in MOL's attempt to obtain the Thailand to Europe business, and in exchange MOL would not compete for Höegh's business on routes from the United States to Africa and the Middle East.

e.  In 2004, MOL and WWL agreed to rig bids with respect to two OEM customers. MOL and WWL agreed that WWL would not compete with MOL for MOL business in the transport of one of the OEM customer's vehicles from South Africa to the United States, and in exchange MOL would not compete for WWL's business in the transport of both OEM customers' vehicles from Europe to the United States.

f.  In 2008 or 2009, MOL, and "K" Line agreed to rig the bids for an OEM customer's business.  MOL was the incumbent for transporting that OEM

16

customer's vehicles from the United States to South Africa.  "K" Line agreed that "K" Line would bid a higher rate than MOL did for this business, and in exchange MOL agreed to not compete for "K" Line's business from the United States to Brazil and Argentina.

g.  From at least 2008 to 2009, CSAV agreed to "respect" NYK Line's Vehicle Carrier Services business for another OEM customer for routes between the United States and Chile.  From at least 2011 to at least 2012, NYK Line agreed to "respect" CSAV's Vehicle Carrier Services business for that same OEM customer on the same routes.

h.  In 2010, CSAV and MOL agreed that MOL would not compete for CSAV's business to transport an OEM customer's vehicles from the United States to Colombia from 2010 to 2012; in furtherance of this agreement, CSAV gave MOL a price to bid.

i.  In August 2011, MOL, NYK Line, and "K" Line agreed to rig the bids for the shipment of an OEM customer's trucks and buses from Japan to the United States. All three companies were incumbent carriers on the route, with NYK Line having the largest share.  They agreed what amount of business each company would seek and at what rates.  They further agreed that if any of the three companies did not obtain the specified business, the others would share some of the business that they won.  NYK Line coordinated the agreement between the companies and provided each with the rates to bid.

j.  In February or March of 2012, executives from MOL and WWL met in person and agreed that MOL would not compete for WWL's business transporting vehicles from the United States to China, and in exchange, WWL would not pursue business transporting an OEM customer's vehicles from the United States to Korea.  In furtherance of this agreement, WWL gave MOL a price to bid on the

United States to China route, and MOL gave WWL a price to bid on the United States to Korea route.

51.     This pervasive scheme to rig the bids submitted to GM and other OEM customers for Vehicle Carrier Services caused prices to be inflated across the Vehicle Carrier Services industry.  The purchase price that GM paid for Vehicle Carrier Services on shipments to and from the United States and elsewhere in the world during the Conspiracy Period was artificially inflated by Defendants' and co-conspirators' bid-rigging agreements.

**B.  Defendants Conspired to Fix, Raise, or Artificially Maintain Prices for Vehicle Carrier Services**

52.     Defendants and their co-conspirators also met periodically throughout the Conspiracy Period and agreed on the prices to charge for Vehicle Carrier Services.  To implement at least some of these agreements, Defendants and their co-conspirators exchanged pricing information, which included confidential GM information such as negotiations, rates, and/or price increases.

53.     Defendants and their co-conspirators specifically targeted GM in these price-fixing agreements.  They discussed and agreed the amount and timing of the price increase, and sought agreement and support from other Defendants and their co-conspirators to insure they would be able to implement the price increase.

54.     Examples of these agreements to fix, raise, or artificially maintain prices for Vehicle Carrier Services include, *inter alia*:

  a.  Beginning in February 1997, MOL, NYK Line, and "K" Line met multiple times at MOL's offices in Tokyo to discuss the upcoming renewal of an OEM customer's contract for Vehicle Carrier Services  Representatives from MOL, NYK Line, and "K" Line agreed that each would ask customers for a price increase for the shipment of vehicles from Japan to the United States and from the United States to Japan;

b.  Around 2002 or 2003, MOL and "K" Line were both shipping vehicles from Europe to North America and agreed to each request a 3 percent to 5 percent price increase;

c.  In late 2007, an OEM customer issued a tender for shipments of vehicles from Europe to the United States; executives from MOL and "K" Line discussed the tender and agreed to request a price increase from the customer;

d.  In late 2007 and early 2008, executives from MOL, NYK Line, and "K" Line met multiple times to try to obtain a 10 percent price increase for Vehicle Carrier Services from their OEM customers, including GM.  For example, executives from NYK Line and MOL met in November 2007 and agreed to increase pricing for Vehicle Carrier Services in 2008.  They also agreed to convince "K" Line to increase its rates.  The following month, executives from MOL and NYK Line had dinner in a restaurant in Tokyo and discussed seeking price increases in 2008.  On or about January 11, 2008, the same executives from MOL and NYK Line had lunch with a representative from "K" Line and agreed to a goal of a 5 percent increase in 2008.  On or about January 22, 2008, executives from MOL, NYK Line, and "K" Line agreed on a target of a 10 percent price increase for 2008 in order to obtain at least a 5 percent increase in 2008.  They further agreed that each of the three companies would approach its principal OEM customers and initially ask for a 10 percent price increase for Vehicle Carrier Services.  MOL, NYK Line, and "K" Line then proceeded to approach their OEM customers as agreed, and they obtained price increases;

e.  In fall 2008, executives from MOL, NYK Line, and "K" Line communicated and agreed to seek a certain price increase for Vehicle Carrier Services.  These executives further agreed that NYK Line and "K" Line would share an OEM customer's business from Japan to the west coast of the United States, and that

NYK Line, "K" Line, and MOL would share the OEM customer's business from Japan to the East Coast of the United States; and

    f.    In November 2011, executives from MOL and Höegh met for dinner and discussed and agreed upon Vehicle Carrier Services rates from New York to West Africa, a route on which they both offered services.

55.    Defendants' and their co-conspirators' agreements to fix, raise, or artificially maintain the price of Vehicle Carrier Services resulted in artificially high prices paid by GM for Vehicle Carrier Services on shipments to and from the United States and elsewhere in the world during the Conspiracy Period.

**C.  Defendants and their Co-conspirators Conspired to Reduce Vehicle Carrier Services Fleet Capacity**

56.    During the Conspiracy Period, Defendants' and their co-conspirators' executives also had frequent communications regarding reducing Vehicle Carrier Services capacity, and they reached agreements concerning capacity reduction.  These capacity reductions, and the higher prices that resulted from them, were an effect of Defendants' and their co-conspirators' conspiracy and were not caused by natural market forces.

57.    Defendants and their co-conspirators reduced capacity by agreeing to scrap and layup vessels.  Scrapping refers to destroying a vessel by breaking it up and selling the pieces for scrap.  A layup occurs when a vessel is taken out of commission but not scrapped.  Scrapping and layups have the same effect on capacity.

58.    During the Conspiracy Period, the Defendants and their co-conspirators discussed scrapping vessels, vessel layups, and plans for building new vessels.  In connection with those discussions, Defendants and their co-conspirators reached agreements to control or reduce capacity, which resulted in artificially inflated prices for Vehicle Carrier Services for shipments to and from the United States and elsewhere in the world.

59.    For instance, from the late 1990s through 2002, executives from MOL, "K" Line, NYK Line, Höegh, and WWL, met twice a year—once in Japan and once in Europe—to discuss

and agree on vessel scrapping and building plans and to exchange data.  They also discussed Vehicle Carrier Services pricing for routes where they believed prices were particularly low. These Defendants continued their data exchange into at least 2003.  These discussions and agreements were intended to control or reduce capacity, and to otherwise fix, raise, maintain, and stabilize prices for Vehicle Carrier Services for shipments to and from the United States and elsewhere in the world.

60.     In 2008, demand for Vehicle Carrier Services fell dramatically as a result of the worldwide financial crisis, leaving Defendants and their co-conspirators with excess capacity.  In response, Defendants and their co-conspirators met and conspired, as they had been doing for years, to reduce the supply of Vehicle Carrier Services to ensure that their prices were insulated from these changes in market conditions.  They were able to maintain artificially inflated prices by engaging in a number of illegal acts, including the following:

     a.  In late 2008 or early 2009, executives from MOL and NYK Line met and agreed to reduce their respective fleet sizes by scrapping RoRo Vessels.  They also agreed to resist price reduction requests from customers;

     b.  "K" Line likewise agreed to scrap some of its vessels after being approached by MOL or NYK Line;

     c.  During late 2008 to early 2009, MOL also discussed fleet reductions and reached understandings concerning such reductions, with at least WWL, Höegh, and EUKOR;

     d.  Per their understandings with MOL, WWL, EUKOR, NYK Line, "K" Line, and Höegh also agreed to reduce the supply of Vehicle Carrier Services by engaging in cold layups[1];

---

[1] In a "cold layup," the vessel sits idle without a crew and is not maintained.

e.  As a result of Defendants' and their co-conspirators' agreements, MOL, NYK Line, "K" Line, and Höegh all reduced their respective capacities, all of which was intended to artificially increase prices for Vehicle Carrier Services; and

f.  Almost no orders for new vessels were placed between 2009 and 2011.

61.  The Defendants' and their co-conspirators' agreements to control or reduce capacity through vessel scrapping and layups resulted in artificially high prices paid by GM for Vehicle Carrier Services on shipments to and from the United States and elsewhere in the world during the Conspiracy Period.

**D.  Government Investigations Targeting Defendants and Co-Conspirators**

62.  Competition authorities in the United States, Canada, Mexico, Japan, the European Union, and Chile have been actively investigating anticompetitive practices with respect to Vehicle Carrier Services.

63.  A grand jury has been convened in Baltimore, Maryland, to investigate alleged anticompetitive conduct involving Vehicle Carrier Services and has issued subpoenas to certain of the Defendants and co-conspirators.

64.  In early September 2012, the Japan Fair Trade Commission ("JFTC"), the European Commission ("EC"), and the DOJ carried out raids and unannounced inspections at the offices of a number of the Defendants and co-conspirators, including at least CSAV, NYK Line, MOL, "K" Line, and WWL; Höegh, EUKOR, and NMCC are also being investigated for the same unlawful conduct.

65.  On or about May 1, 2014, CSAV pleaded guilty to violating Section 1 of the Sherman Act, 15 U.S.C. § 1, for conspiring to suppress and eliminate competition for Vehicle Carrier Services to and from the United States from as early as January 2000 through at least September 2012.  In pleading guilty, CSAV specifically admitted that the conspiracy affected certain U.S.-based manufacturers of cars and trucks.  CSAV agreed to pay a criminal fine of $8.9 million.

66.     On or about November 17, 2014, "K" Line pleaded guilty to violating Section 1 of the Sherman Act, 15 U.S.C. § 1, for conspiring to suppress and eliminate competition for Vehicle Carrier Services to and from the United States and elsewhere from as early as February 1997 through at least September 2012.  In pleading guilty, "K" Line specifically admitted that the conspiracy affected certain United States-based manufacturers of cars and trucks.  "K" Line agreed to pay a criminal fine of $67.7 million.

67.     On or about March 11, 2015, NYK Line pleaded guilty to violating Section 1 of the Sherman Act, 15 U.S.C. § 1, for conspiring to suppress and eliminate competition for Vehicle Carrier Services to and from the United States and elsewhere from at least February 1997 through at least September 2012.  In pleading guilty, NYK Line specifically admitted that the conspiracy affected certain United States-based manufacturers of cars and trucks.  NYK Line agreed to pay a criminal fine of $59.4 million.  Further, in pleading guilty, NYK Line's corporate representative expressed NYK Line's "deepest regret" that its employees engaged in serious misconduct and violated the antitrust laws, and informed the Court that NYK Line took "full responsibility" for its employees' conduct which violated United States law.

68.     The criminal informations filed by the DOJ against CSAV, "K" Line, and NYK Line further state that, during the relevant period, CSAV, "K" Line, NYK Line and their co-conspirators attended meetings and engaged in communications regarding bids and tenders in which they agreed to allocate markets by not competing for each other's existing routes; they agreed to not compete against each other on tenders by not bidding or agreeing to the prices they would bid on such tenders; they discussed and exchanged prices so as to not undercut each other's pricing on tenders; they submitted bids in accordance with agreements reached; and they provided Vehicle Carrier Services to and from the United States and elsewhere at collusive and non-competitive prices.

69.     Several executives from "K" Line and NYK Line have been indicted on similar charges.  On or about January 30, 2015, "K" Line employee Hiroshige Tanioka pleaded guilty to violating Section 1 of the Sherman Act, 15 U.S.C. § 1, for participating in the conspiracy from at

least April 1998 until at least April 2012.  Mr. Tanioka was sentenced to serve an 18-month prison term and to pay a criminal fine of $20,000.  On or about February 6, 2015, "K" Line employee Takashi Yamaguchi also pleaded guilty to violating Section 1 of the Sherman Act, 15 U.S.C. § 1, for participating in the conspiracy from at least April 1998 until at least April 2012. Mr. Yamaguchi was sentenced to serve a 14-month prison term and to pay a criminal fine of $20,000.  On or about March 26, 2015, "K" Line employee Toru Otoda pleaded guilty to violating Section 1 of the Sherman Act, 15 U.S.C. § 1, for participating in the conspiracy from at least November 2010 until at least September 2012.  Mr. Otoda was sentenced to serve an 18-month prison term and to pay a $20,000 criminal fine.

70.    On or about March 10, 2015, NYK Line employee Susumu Tanaka pleaded guilty to violating Section 1 of the Sherman Act, 15 U.S.C. § 1, for participating in the conspiracy from at least April 2004 until at least September 2012.  Mr. Tanaka was sentenced to serve a 15-month prison term and to pay a $20,000 criminal fine.

71.    Despite the fact there are victims—including GM—of these criminal antitrust violations, Defendants and their co-conspirators avoided being sentenced to pay restitution because they represented to the criminal courts that restitution was not necessary due to the pending civil actions related to their illegal conduct.

72.    On or about March 18, 2014, the JFTC issued cease and desist orders and fines totaling $223 million against NYK Line, "K" Line, WWL, and NMCC, finding that they violated Article 3 of Japan's Antimonopoly Act with regard to Vehicle Carrier Services.  Although the JFTC named MOL as a violator, it exempted MOL from these sanctions because it accepted MOL into its leniency program.

73.    The JFTC's investigation revealed that, among other things, NYK Line, "K" Line, MOL, WWL, and NMCC, from at least as early as mid-January 2008 to September 6, 2012, agreed to fix freight rates and/or colluded on freight rate quotations, and refrained from bidding against one another for the purpose of securing incumbent trades.  The JFTC specifically found

that, among others, routes between ports in the United States and Japan were impacted by these Defendants' conduct.

74.     On the same day the JFTC announced its cease and desist orders and fines, MOL issued a press release offering its "sincere apologies" to its customers and the public and pledging to make "best efforts to prevent any recurrence" of its unlawful conduct, to further enhance its compliance structure, and to regain public confidence.  In view of the seriousness of MOL's unlawful conduct, MOL also disciplined at least its Chairman, President, and Senior Executive Officer responsible for its Vehicle Carrier business.

75.     That same day, "K" Line also issued a statement expressing its "sincere regret" for its unlawful conduct, and vowing to "take comprehensive measures to ensure strict compliance with all applicable laws and regulations."  In light of the gravity of "K" Line's unlawful conduct, its CEO and the Directors and Executive Officers in charge of its Vehicle Carrier business decided to return 10-30% of their monthly compensation for a period of three months.  NYK Line also issued a press release apologizing for its unlawful conduct.

76.     On or about January 27, 2015, Chile's Fiscalía National Económica ("FNE") filed an injunction with the Tribunal de Defensa de la Libre Competencia ("TDLC"), requesting that the TDLC impose fines on "K" Line, MOL, NYK Line, and EUKOR for violating Article 3 of Chile's Decree Law No. 211 by agreeing to allocate markets for Vehicle Carrier Services. Although the FNE found that CSAV participated in such conduct, the FNE asked that CSAV's fine be waived because CSAV met the FNE's requirements for leniency.

77.     The FNE's investigation uncovered, among other things, that NYK and CSAV agreed to allocate markets for Vehicle Carrier Services for routes between America and Chile. This agreement was reached during in-person meetings in the United States, as well as through e-mails and telephone calls.  As part of this agreement, NYK and CSAV agreed, from 2000 to at least 2012, to allocate GM's Vehicle Carrier Services business for routes between America and Chile to CSAV.

E.   **Defendants and Co-Conspirators Engaged in Anticompetitive Conduct in Other Transportation Markets**

78.     Defendants and their co-conspirators participate in additional transportation markets, such as container shipping, bulk shipping, and freight forwarding.  The affiliates and subsidiaries of a number of Defendants and their co-conspirators have recently pled guilty and agreed to pay millions of dollars in fines for violating the antitrust laws in other transportation markets.

79.     In 2007, the United States and European Union launched an investigation into price fixing among international air freight forwarders, including the affiliates and subsidiaries of certain Defendants and their co-conspirators.  The JFTC investigated as well.

80.     On March 19, 2009, the JFTC ordered twelve companies to pay $94.7 million in fines for violations of Japan's Antimonopoly Act.  Included among the twelve companies were "K" Line Logistics, Ltd., Yusen Air & Sea Services Co., and MOL Logistics (Japan) Co., Ltd.

81.     "K" Line Logistics, Ltd. is a subsidiary of Defendant "K" Line Japan, Yusen Air & Sea Services Co. is a subsidiary of Defendant NYK Japan, and MOL Logistics (Japan) Co., Ltd. is a subsidiary of Defendant MOL Japan.

82.     The JFTC concluded that the companies had, over a five-year period, met and agreed to, among other things, the amount of fuel surcharges, security charges, and explosive inspection charges that they would charge their international air freight forwarding customers. The agreements were, according to the JFTC, negotiated at meetings of the Japan Air Cargo Forwarders Association.

83.     On September 30, 2011 in the United States, co-conspirator MOL Japan's subsidiary, MOL Logistics (Japan) Co., Ltd., pleaded guilty to Sherman Act violations related to price fixing.

84.     On March 28, 2012, the European Union fined fourteen international groups of companies, including Defendant NYK Japan's subsidiary, Yusen Shenda Air & Sea Service

(Shanghai) Ltd., a total of $219 million for their participation in the air cargo cartels and for violating European Union antitrust rules.

85.     On March 8, 2013, the DOJ announced that Defendant "K" Line's subsidiary, "K" Line Logistics, Ltd., and Defendant NYK Japan's subsidiary, Yusen Logistics Co., Ltd., agreed to pay criminal fines of $3,507,246 and $15,428,207, respectively, for their roles in a conspiracy to fix certain freight forwarding fees for cargo shipped by air from the United States to Japan.  "K" Line Logistics, Ltd. and Yusen Logistics Co., Ltd. pleaded guilty to meeting with co-conspirators, agreeing to what freight forwarding service fees should be charged on air cargo shipments, and actually levying those fees on its customers from about September 2002 until at least November 2007.

## VI.     SUSCEPTIBILITY OF VEHICLE CARRIER SERVICES TO COLLUSION

86.     Vehicle Carrier Services are particularly susceptible to collusion because of high concentration, the commodity-like nature of the services at issue, high barriers to entry, inelasticity of demand, and ample opportunities for the Defendants and their co-conspirators to meet and collude.

### A.     Concentration

87.     The Vehicle Carrier Services market is highly concentrated.  During the Conspiracy Period, Defendants and their co-conspirators alone accounted for roughly two-thirds or more of the global capacity of Vehicle Carrier Services.

### B.     Commodity-Like Services

88.     Vehicle Carrier Services are homogenous, commodity-like services.  Each Defendant and co-conspirator has the capability to provide the same or similar Vehicle Carrier Services.  Purchasers of Vehicle Carrier Services choose providers almost exclusively based on price, because the qualitative differences between each provider are negligible.  Thus, from GM's perspective, providers of Vehicle Carrier Services are essentially interchangeable.

89.     The homogenous and interchangeable nature of Vehicle Carrier Services makes it easier to create and maintain an unlawful conspiracy, agreement, or cartel because coordinating

conduct and rigging bids, as well as policing those collusively-set prices, is less difficult than if Defendants and their co-conspirators had distinctive services that could be differentiated based upon features other than price.

### C. Barriers to Entry

90.     There are substantial entry barriers that a new provider of Vehicle Carrier Services would face.  A new entrant would encounter significant hurdles, including multi-million dollar start-up costs associated with acquiring ships and equipment, distribution infrastructure, and hiring skilled labor and a sales force.

91.     Transporting Vehicles without damage across oceans requires highly-specialized and sophisticated equipment, resources, and industry knowledge.  The ships that make such transport possible are highly-specialized, and feature high sides, multiple interior decks, and no container cargo space.  These characteristics restrict the use of the ships to the Vehicle Carrier Services market.  A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing or acquiring a fleet of RoRo Vessels and other equipment, energy, transportation, distribution infrastructure and skilled labor. The estimated capital cost of a RoRo Vessel can range from $95 million to $180 million.

92.     Additionally, the nature of the Vehicle Carrier Services industry requires the establishment of a network of routes to serve a particular set of customers—OEMs—with whom Defendants have established long-term relationships.  The existence of these established routes and long-term contracts increases switching costs for customers and presents an additional barrier to entry.

93.     The Vehicle Carrier Services market also involves economies of scale and scope, which present further barriers to entry:

      a.  Economies of scale exist where firms can lower the average cost per unit through increased production, since fixed costs are shared over a larger number of units. Fuel accounts for a significant amount of all operational costs for providers of Vehicle Carrier Services.  However, providers of Vehicle Carrier Services are less

sensitive to fuel prices than other modes of transportation, providing opportunities to exploit economies of scale. As fuel prices increased in the last 5-10 years, market participants were incentivized to increase the average size of vessels. This reflects the presence of economies of scale, because fuel costs did not increase proportionally as vessel size grew.

b. Economies of scope exist where firms achieve a cost advantage from providing a wide variety of products or services. The major providers of Vehicle Carrier Services, including Defendants and their co-conspirators, own related shipping or transportation businesses they can utilize to provide additional services to clients, such as the operation of dedicated shipping terminals and inland transportation of Vehicles.

### D. **Demand Inelasticity to Lack of Substitutes**

94.     Demand for Vehicle Carrier Services is highly inelastic because there are no close substitutes. A RoRo Vessel is built specifically to transport the large, irregular shapes of wheeled vehicles, with the ability to adjust to various cargo shapes and sizes, and to enable those vehicles to be quickly and efficiently loaded and unloaded from the vessel. A RoRo Vessel is the only ocean vessel that has the carrying capacity for a large number of Vehicles.

95.     Defendants' and their co-conspirators' primary customers—OEMs—cannot reasonably replace Vehicle Carrier Services with other services or reduce usage of these services, even if such services are substantially more expensive for OEM customers relative to other modes of transportation. Although Vehicles can theoretically be placed into containers and loaded by crane on to a container ship, this is not a reasonable substitute for Vehicle Carrier Services for the following reasons, *inter alia*:

a. To transport a Vehicle inside a container, special inserts are typically placed inside the container to maximize the number of vehicles that can fit inside;

b. Once a Vehicle is driven into a container, it needs to be secured within the container and then transported to a port to be loaded by crane onto a vessel;

    c.    The steps outlined above take considerably more time than rolling Vehicles onto RoRo Vessels and are associated with additional costs;

    d.    The cost of shipping a Vehicle in a container is typically higher than—and can be as much as two to three times the cost of—shipping that same Vehicle via a RoRo Vessel;

    e.    Vehicles may be damaged when they are driven in and out of containers, and their close proximity in containers during shipping can also cause damage; and

    f.    If multiple Vehicles are placed inside a container in a stalked fashion, there is a risk that oil or other fluids from one car can leak on other cars, also causing damage.

96.    Additionally, compared to container shipping, providers of Vehicle Carrier Services have considerably fewer routes and limited geographical coverage.  Vehicle Carrier Services to and from the United States and elsewhere in the world are generally limited to major shipping ports.

97.    Moreover, because a container ship functions based on the uniformity of the cargo—everything must fit within the standardized containers—it is not conducive to transporting larger and more irregularly-shaped goods, such as some types of Vehicles—trucks and agricultural and construction equipment.

98.    Therefore, a price increase in Vehicle Carrier Services does not induce customers, like GM, into using other types of cargo vessels or services.  GM must employ Vehicle Carrier Services to facilitate the transport of Vehicles to and from the United States and elsewhere in the world, regardless of whether prices persist at supra-competitive levels.  By allowing producers to raise prices without triggering customer substitution and lost sales revenue, inelastic demand facilitates collusion.

    **E.**  **Opportunities for Conspiratorial Communications**

99.    The shipping industry has been characterized as a small world where many of the key figures know each other.  Many employees of the Defendants and their co-conspirators have

spent their entire careers in the shipping industry and had formed personal relationships with other key figures.  Key employees have also transferred between the Defendant and co-conspirator companies, fostering familiarity and connections between professed competitors and facilitating high-level coordination for the conspiracy.

100.    Defendants are members of several trade associations that provide opportunities to meet under the auspices of legitimate business.  For example, several Defendants and their co-conspirators are members of the ASF Shipping Economics Review Committee.  The Committee had meetings, including one in Tokyo on March 2, 2010, that was attended by representatives of several Defendants and their co-conspirators, including "K" Line and NYK Line.

101.    Co-conspirators CSAV (through CSAV America), "K" Line America, MOL (through MOL (America), Inc.) and Defendants NYK America and WWL America are members of the United States Maritime Alliance, Ltd.

102.    Defendants NYK America and WWL America and co-conspirators "K" Line and MOL (through MOL (America), Inc.) are members of the New York Shipping Association, Inc. and the Pacific Maritime Association.

103.    Co-conspirators "K" Line, MOL, and CSAV and Defendants NYK Line and WWL are members of the World Shipping Council.

104.    Co-conspirators "K" Line, MOL, and CSAV and Defendant NYK Line were members of the European Liner Affairs Association, which was later absorbed by the World Shipping Council.

105.    Defendant NYK Line and co-conspirators "K" Line and MOL are members of the Japan Shipowners' Association, a trade association based in Japan.

106.    These associations—and the meetings, trade shows, and other industry events that stem from them—provided Defendants and their co-conspirators with ample opportunities to meet and conspire, as well as to perform affirmative acts in furtherance of the conspiracy. Defendants and their co-conspirators used industry events as opportunities to speak with competitors about rigging bids, reducing capacity, and other anticompetitive agreements.

107.    Defendants and their co-conspirators also routinely enter into vessel-sharing agreements whereby they reserve space on each other's RoRo Vessels.  These sharing or chartering agreements are very common in the international maritime shipping industry.[2]

108.    While ostensibly entered into to optimize utilization and increase efficiency, such sharing and chartering agreements also provide opportunities for Defendants and their co-conspirators to discuss market shares, routes, and rates for Vehicle Carrier Services, and to enter into illegal agreements to fix prices, rig bids, restrain capacity, and allocate markets.

109.    Defendants and their co-conspirators at times entered into agreements that were exempt from the federal antitrust laws because they were ultimately filed with the FMC.  These immunized agreements allowed them to discuss rates and other sensitive information related to Vehicle Carrier Services.  However, such discussions gave Defendants and their co-conspirators the opportunity to enter into agreements that were illegal—not in any way immunized from the antitrust laws—to fix prices, rig bids, restrain capacity, and allocate markets that are not immunized from the antitrust laws.

## VII.    GM IN THE UNITED STATES PURCHASED VEHICLE CARRIER SERVICES DIRECTLY FROM DEFENDANTS AND THEIR CO-CONSPIRATORS AT PRICES ILLEGALLY RAISED THROUGH THEIR CONSPIRACY

110.    During and after the Conspiracy Period, GM purchased Vehicle Carrier Services directly from providers of Vehicle Carrier Services, including Defendants and their co-conspirators.  GM used such Vehicle Carrier Services to transport GM Vehicles to and from ports in the United States and elsewhere in the world, including ports in North America, South America, Europe, Africa, the Middle East, Asia, and Australia.  Defendants' and their co-conspirators' unlawful conspiracy increased the prices of Vehicle Carrier Services purchased directly by GM in the United States.  The illegally-inflated prices the Defendants and their co-

---

[2] A "space charter" occurs when a shipping carrier charters space on another shipping carrier's vessel.  A "time charter" occurs when a shipping carrier fully charters another vehicle carrier's vessel.

conspirators charged GM for these Vehicle Carrier Services raised the costs to GM of shipping each GM Vehicle into or out of the United States and elsewhere in the world.

111.    Automobile OEMs, like GM, do not purchase Vehicle Carrier Services using published rates or tariffs.  Rather, GM procurement teams based in the United States negotiated the rates, volume levels, and other conditions that governed GM's purchases of Vehicle Carrier Services.  These negotiations typically consisted of:

      a.   Bilateral negotiations to renew service contracts with providers of Vehicle Carrier Services;

      b.   Price change requests to change freight rates from providers of Vehicle Carrier Services; and

      c.   Tenders whereby multiple carriers are invited to bid for a new or renewed contract award (an initial bid, followed by a second-round bid, and final negotiations).

112.    GM's procurement teams often established benchmark or target pricing that a provider of Vehicle Carrier Services would be encouraged to meet.  These benchmark or target prices were determined by reviewing pricing from prior years for the same route, and looking at pricing for other routes GM used for Vehicle Carrier Services, as well as market factors and conditions.

113.    Through this process, GM's United States procurement teams evaluated, qualified, and selected providers of Vehicle Carrier Services to service GM, drafted requests for quotes for Vehicle Carrier Services that would be purchased to transport GM Vehicles to and from the United States and elsewhere in the world, reviewed the responses to requests for quotes, negotiated rates, volumes, and other conditions with providers of Vehicle Carrier Services, selected who would win GM's Vehicle Carrier Services business, and awarded GM's Vehicle Carrier Services business.

114.    These negotiations are then memorialized in a service contract, which governs all Vehicle Carrier Services provided by each Vehicle Carrier Services provider to GM, for the time

period and shipping routes designated in the service contract.  GM's service contracts for

Vehicle Carrier Services typically last for two years.  As a result, GM typically issues tenders

every two years for the routes it uses to ship Vehicles.  As part of each service contract, each

provider of Vehicle Carrier Services, *inter alia*:

     a.  Agreed to comply with all applicable laws, rules, regulations, orders, conventions, ordinances, or standards of the countries where services under the contract are provided;

     b.  Represented that it would not engage in corrupt business practices in providing Vehicle Carrier Services;

     c.  Agreed to keep confidential and not to disclose confidential information such as negotiations, rates, and charges to any present or future competitor; and

     d.  Agreed to provide Vehicle Carrier Services in an economic manner.

115.     Accordingly, the prices and other conditions for GM's Vehicle Carrier Services

were negotiated and agreed upon between GM's United States procurement teams and providers

of Vehicle Carrier Services, including Defendants and their co-conspirators.  At all relevant

times, GM in the United States directed the price, quantity, and other conditions of Vehicle

Carrier Services purchased by GM to transport GM Vehicles.  Moreover, GM in the United

States issued payments directly to providers of Vehicle Carrier Services, including Defendants

and their co-conspirators.

116.     As alleged in this Complaint, the prices of all of GM's purchases of Vehicle

Carrier Services during the Conspiracy Period were artificially inflated by Defendants' and their

co-conspirators' unlawful conduct.  GM suffered the entire injury resulting from the artificially-

inflated price of Vehicle Carrier Services, and the injury from the purchase of these price-fixed

Vehicle Carrier Services was ultimately borne by GM in the United States.

## VIII.   DEFENDANTS' CONDUCT BREACHED EACH CONTRACT WITH GM

117.     During and after the Conspiracy Period, GM and its providers of Vehicle Carrier

Services, including Defendants NYK Line, WWL Norway, and EUKOR, entered into service

contracts and amendments thereto for Vehicle Carrier Services by which providers of Vehicle Carrier Services agreed to provide Vehicle Carrier Services to GM, and GM agreed to pay the providers of Vehicle Carrier Services a price negotiated by GM and the providers of Vehicle Carrier Services.

118.     Pursuant to each contract, GM's providers of Vehicle Carrier Services agreed to comply with all applicable laws, rules, regulations, orders, conventions, ordinances, or standards of the countries where services under each contract is provided.

119.     Pursuant to each contract, GM's providers of Vehicle Carrier Services also represented that they would not engage in corrupt business practices in providing Vehicle Carrier Services.

120.     Pursuant to each contract, GM's providers of Vehicle Carrier Services also agreed to keep confidential and not to disclose confidential information such as negotiations, rates, and charges to any present or future competitor.

121.     Pursuant to each contract, GM's providers of Vehicle Carrier Services also agreed to provide Vehicle Carrier Services in an economic manner.

122.     GM has performed all of the obligations, conditions, and agreements required of it pursuant to each contract with its providers of Vehicle Carrier Services.  GM paid its providers of Vehicle Carrier Services, including Defendants NYK Line, WWL Norway, and EUKOR, for all Vehicle Carrier Services they provided to GM.

123.     As set forth in this Complaint, Defendants NYK Line, WWL Norway, and EUKOR did not comply with the terms of their contracts with GM, including:  (1) the provision requiring compliance with all applicable laws of the countries where services under these contracts are provided; (2) the representation that they would not engage in corrupt business practices in providing Vehicle Carrier Services; (3) the provision requiring them to keep confidential and not to disclose confidential information to any present or future competitor; and (4) the provision requiring them to provide Vehicle Carrier Services in an economic manner. Defendants NYK Line, WWL Norway, and EUKOR, by engaging in the anticompetitive and

criminal conduct alleged herein, and/or by providing GM with Vehicle Carrier Services at prices inflated by that conduct, egregiously violated those terms.  Accordingly, Defendants NYK Line, WWL Norway, and EUKOR breached each contract with GM.

## IX.   ACCRUAL OF CLAIM, FRAUDULENT CONCEALMENT, AND EQUITABLE ESTOPPEL

124.     Prior to September 6, 2012, when the global investigation of Defendants' and their co-conspirators' misconduct was first publicly reported, a reasonable person under the circumstances would have believed the Vehicle Carrier Services to be a competitive industry and, thus, would not have been alerted to begin to investigate the legitimacy of Defendants' prices for Vehicle Carrier Services before that time.

125.     Conspiracies to fix prices, rig bids, restrain capacity, and allocate markets are, by their very nature, inherently self-concealing.  As alleged in this Complaint, Defendants and their co-conspirators had secret in-person and other communications to rig bids, restrain capacity, allocate markets, and to otherwise fix, raise, maintain, or stabilize prices for Vehicle Carrier Services.  These acts in furtherance of the conspiracy were affirmatively concealed and carried out in a manner specifically designed to avoid detection.  As a matter of fact, if Defendants' and their co-conspirators' conspiracy was to successfully fix, raise, maintain, or stabilize prices, the conspirators needed to ensure that customers and competition authorities did not discover the existence of the conspiracy.

126.     Despite engaging in the secret anticompetitive conduct alleged herein, prior to the time when the investigations by the antitrust regulators became public, neither Defendants nor their co-conspirators disclosed to GM that they were engaging in the unlawful conduct alleged in this Complaint.  GM did not discover and could not have discovered the alleged contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence.

127.     Aside from engaging in secret communications and failing to disclose their unlawful conduct, Defendants and their co-conspirators also concealed the conspiracy alleged in this Complaint by engaging in other acts to create the illusion of competition.  For example, as

alleged in this Complaint, Defendants and their co-conspirators at times used complementary bidding (also known as "cover" or "courtesy" bidding).  Complementary bidding occurred when a Defendant or co-conspirator requested that another Defendant or co-conspirator submit a bid that was higher than the bid of the Defendant or co-conspirator that made the request.  Such complementary bids were intended to give the appearance of genuine competitive bidding to conceal Defendants' and their co-conspirators' secretly-inflated prices.

128.     Defendants and their co-conspirators also affirmatively concealed their conspiracy by falsely claiming that the Vehicle Carrier Services market was "competitive" and by offering pretextual reasons for price increases.  This created the illusion that prices were determined as a result of market-based forces, such as increased demand and tight supply.  For example, Defendants and their co-conspirators made the following representations:

a.  CSAV repeatedly stated that it operated in a very competitive market for Vehicle Carrier Services.  CSAV Annual Reports:  Year 2003 at 10, 23; Year 2005 at 19, 42; Year 2006 at 15, 149; Year 2007 at 15, 39; Year 2008 at 17, 35; Year 2009 at 17, 36; Year 2010 at 15, 35; Year 2011 at 15, 22; Year 2012 at 19.

b.  "K" Line stated that it competed with many shipping companies and promised to comply with applicable laws of the international community.  "K" Line Annual Report 2008, at 55; "K" Line Annual Report 2009, at 1.

c.  MOL stated that competitive costs were the essence of its excellence.  MOL Annual Report 2000, at 9.

d.  NYK explained that prices were increased were the result of increased demand and that it competed globally with other Vehicle Carrier Services providers. NYK Line Annual Report 2009, at 8; NYK Line Annual Report 2012, at 102.

e.  WWL stated that its Vehicle Carrier Services were affected by general trends in the world economy and that it operated in a tight market with fierce competition. Wilh. Wilhelmsen ASA Annual Reports:  Year 2002 at 15; Year 2004, at 9; Year 2009, at 11; Year 2010, at 19-20.

129.     Because Defendants and their co-conspirators kept the unlawful conduct alleged in this Complaint secret, GM was not aware of the unlawful conduct alleged in this Complaint at any point in time before the investigations by the antitrust regulators became public on September 6, 2012.  Accordingly, GM did not know before that time that it was paying supra-competitive prices for Vehicle Carrier Services during the Conspiracy Period.

130.     Aside from the fact that Defendants and their co-conspirators made deliberate efforts to conceal their unlawful conduct, no events raised, or should have raised, suspicions on GM's part that the Defendants and their co-conspirators were engaging in a conspiracy to fix prices and allocate markets for Vehicle Carrier Services until certain Defendants were raided by competition authorities in September 2012.

131.     Indeed, GM used a method of purchasing Vehicle Carrier Services that caused it to believe in good faith at the time that it was receiving competitive prices for Vehicle Carrier Services that it purchased from one or more of the Defendants and/or their co-conspirators.  As part of this process, GM invites more than one provider of Vehicle Carrier Services to bid for a new or renewed contract award.  GM next evaluates the quotes submitted by providers of Vehicle Carrier Services, including by comparing these bids to historical rates.  GM then invites certain providers of Vehicle Carrier Services to submit second-round bids, and lastly, to participate in final negotiations.  This process relied on Defendants' and their co-conspirators' historic rates, as well as Defendants' and their co-conspirators current quotes, all of which were artificially inflated by the conspiracy.  Thus, unfortunately, as a proximate and direct result of Defendants' and their co-conspirators concealment of their conduct, GM was justifiably unaware of this conduct, despite its due diligence.  At no point during the Conspiracy Period did any of the Defendants or their co-conspirators inform GM that they had been conspiring to rig bids or increase prices GM paid for its Vehicle Carrier Services.

132.     Thus, none of the facts or information available to GM, if investigated with reasonable diligence, would have led to the discovery of the conspiracy alleged in this Complaint prior to the time when the investigations by the antitrust regulators became public.

133.     Accordingly, Defendants and their co-conspirators engaged in a successful anticompetitive conspiracy concerning Vehicle Carrier Services, which they affirmatively concealed.

134.     By reason of the foregoing, the running of any statute of limitations has been tolled with respect to the claims that GM has alleged in this Complaint.

## X.     EFFECT ON U.S. COMMERCE

135.     During the Conspiracy Period, Defendants and their co-conspirators collectively controlled a majority of the market for Vehicle Carrier Services, globally, in the United States, and within this judicial district.

136.     The conspiracy alleged herein has affected billions of dollars of United States commerce.

137.     During the Conspiracy Period, each Defendant and co-conspirator, or one or more of its subsidiaries and/or affiliated joint ventures, sold Vehicle Carrier Services throughout the United States and elsewhere in the world in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

138.     Defendants and their co-conspirators have each used instrumentalities of interstate commerce to sell Vehicle Carrier Services throughout the United States.

139.     Activities of Defendants and their co-conspirators, including the marketing and sale of Vehicle Carrier Services, have taken place in the United States; have been intended to have and have had a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate trade and commerce in the United States and upon import commerce with foreign nations; and have caused antitrust injury in the United States.  Indeed, Defendants' and their co-conspirators' anticompetitive conduct directly targeted GM's purchase of Vehicle Carrier Services.

140.     Defendants' and their co-conspirators' conspiracy and conduct described herein have directly and substantially affected interstate commerce in that Defendants and their co-conspirators have deprived GM and other entities of the benefits of free and open competition in

the purchase of Vehicle Carrier Services in the United States.  GM directly purchased Vehicle Carrier Services in the United States, and GM paid more for such services than it would have paid under conditions of free and open competition.

## XI.    INJURY TO PLAINTIFF

141.    As a result of their unlawful contract, combination, or conspiracy, Defendants and their co-conspirators succeeded in allocating markets, rigging bids, restraining capacity, and otherwise fixing, raising, maintaining, or stabilizing prices for Vehicle Carrier Services charged throughout the world, including shipments to and from the United States and elsewhere in the world.

142.    Defendants' and their co-conspirators' agreements to allocate markets, rig bids, restrain capacity, and to otherwise fix, raise, or artificially maintain prices for Vehicle Carrier Services resulted in artificially-inflated prices for Vehicle Carrier Services, including those purchased by GM for Vehicles shipped to or from the United States and elsewhere in the world.

143.    GM has been injured in its business and property because it has paid more for Vehicle Carrier Services than it would have paid in a competitive market.  Such injuries are of the type the antitrust laws were designed to prevent and flow directly from Defendants' and their co-conspirators' unlawful conduct.

144.    Defendants' and their co-conspirators' unlawful contract, combination, or conspiracy has had at least the following effects:

a.    Competition for Vehicle Carrier Services has been restrained;

b.    Prices paid by GM for Vehicle Carrier Services were fixed, stabilized, or maintained at supra-competitive levels throughout the world, including prices paid for Vehicle Carrier Services to and from the United States and elsewhere in the world;

c.    Markets for Vehicle Carrier Services were allocated among Defendants and their co-conspirators;

  d. Price competition regarding the sale of Vehicle Carrier Services was restrained, suppressed, or eliminated throughout the world, including for shipments to and from the United States and elsewhere in the world, thus raising the prices of Vehicle Carrier Services above what they would have been absent Defendants' and their co-conspirators' actions; as a result, GM paid more for Vehicle Carrier Services than it would have paid in a competitive marketplace;

  e. GM, as a purchaser of Vehicle Carrier Services, has been deprived of the benefits of free and open competition; and

  f. As a direct and proximate result of the unlawful combination, contract or conspiracy, GM has been injured and financially damaged in its business and property, in amounts to be determined.

## XII. VIOLATIONS ALLEGED

### A. FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS: VIOLATION OF SHERMAN ACT

145. GM incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

146. Beginning at a time presently unknown to GM, but at least as early as February 1, 1997, and continuing through at least September 2012, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

147. During the Conspiracy Period, Defendants and their co-conspirators committed overt acts in furtherance of the conspiracy, including, *inter alia*:

  a. Agreeing to rig bids for the sale of for Vehicle Carrier Services in the United States and elsewhere in the world;

41

b.  Agreeing to charge prices at certain levels and otherwise to fix, increase, maintain, and/or stabilize prices of Vehicle Carrier Services sold in the United States and elsewhere in the world;

c.  Refraining from competing by refusing to offer Vehicle Carrier Services sold in the United States and elsewhere in the world at prices below the agreed-upon price;

d.  Agreeing to allocate markets for Vehicle Carrier Services in the United States and elsewhere in the world;

e.  Agreeing to restrain capacity for Vehicle Carrier Services sold in the United States and elsewhere in the world;

f.  Participating in meetings, conversations, and communications with co-conspirators regarding customers, capacity, and prices to be charged for Vehicle Carrier Services sold in the United States and elsewhere in the world; and

g.  Meeting with co-conspirators to keep the existence of the conspiracy unknown and to foster the illegal anti-competitive conduct described herein.

148.    The combination and conspiracy alleged herein has had the following effects, including, *inter alia*:

a.  Price competition in the sale of Vehicle Carrier Services has been restrained, suppressed, and/or eliminated;

b.  Prices for Vehicle Carrier Services sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, noncompetitive levels; and

c.  GM has been deprived of the benefits of free, open, and unrestricted competition.

149.    Defendants and their co-conspirators engaged in anticompetitive activities for the purpose of effectuating unlawful agreements to allocate markets, rig bids, restrain capacity, and to otherwise fix, maintain, raise, and/or stabilize prices of Vehicle Carrier Services.

42

150.     As a direct and proximate result of Defendants' illegal agreement, contract, combination, trust, and/or conspiracy, GM has been injured and damaged in its business and property in an amount to be determined, and under Section 4 of the Clayton Act, 15 U.S.C. § 15, is entitled to recover threefold the damages sustained.

151.     The conduct of Defendants and their co-conspirators constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### B.  SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS: VIOLATION OF THE DONNELLY ACT

152.     GM incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

153.     Beginning at a time presently unknown to GM, but at least as early as February 1, 1997, and continuing through at least September 31, 2012, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade in violation of the Donnelly Act, New York General Business Law §§ 340, *et seq.* During the Conspiracy Period, Defendants and their co-conspirators committed overt acts in furtherance of the conspiracy, including, *inter alia*:

a.  Agreeing to rig bids for the sale of for Vehicle Carrier Services in New York and elsewhere;

b.  Agreeing to charge prices at certain levels and otherwise to fix, increase, maintain, and/or stabilize prices of Vehicle Carrier Services sold in New York and elsewhere;

c.  Refraining from competing by refusing to offer Vehicle Carrier Services sold in New York and elsewhere at prices below the agreed-upon price;

d.  Agreeing to allocate markets for Vehicle Carrier Services in New York and elsewhere;

e.  Agreeing to restrain capacity for Vehicle Carrier Services sold in New York and elsewhere;

    f.   Participating in meetings, conversations, and communications with co-conspirators regarding customers, capacity, and prices to be charged for Vehicle Carrier Services sold in New York and elsewhere;

    g.   Meeting with co-conspirators to keep the existence of the conspiracy unknown and to foster the illegal anti-competitive conduct described herein; and

    h.   Transporting Vehicles by Vehicle Carrier Services at supracompetitive prices to customers, such as GM, in New York and elsewhere.

154.    The combination and conspiracy alleged herein has had the following effects, including, *inter alia*:

    a.   Price competition in the sale of Vehicle Carrier Services has been restrained, suppressed, and/or eliminated in New York and elsewhere;

    b.   Prices for Vehicle Carrier Services sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, noncompetitive levels in New York and elsewhere; and

    c.   GM has been deprived of the benefits of free, open, and unrestricted competition.

155.    By reason of the foregoing, Defendants' and their co-conspirators' conspiracy substantially affected New York commerce.  GM is also entitled to the protection of the laws of New York because GM, as well as Defendants and their co-conspirators, conducted a substantial volume of business in New York.  Indeed, a substantial number of GM Vehicles were transported to and from the Port of New York and New Jersey via Defendants' and their co-conspirators' Vehicle Carrier Services.  Moreover, during the Conspiracy Period, at least one Defendant or co-conspirator maintained its principal place of business in New York.  GM and Defendants and their co-conspirators also selected New York law to govern the service contracts GM entered into with Defendants and their co-conspirators for GM's purchases of Vehicle Carrier Services.  As a result of GM's, Defendants', and their co-conspirators' presence in New York and the substantial business they conduct in New York, GM is entitled to the protection of the Donnelly Act.

156.     Defendants and their co-conspirators engaged in anticompetitive activities for the purpose of effectuating unlawful agreements to allocate markets, rig bids, restrain capacity, and to otherwise fix, maintain, raise, and/or stabilize prices of Vehicle Carrier Services.

157.     As a direct and proximate result of Defendants' and their co-conspirators' illegal agreement, contract, combination, trust, and/or conspiracy, GM has been injured and damaged in its business and property in an amount to be determined.

158.     As a result of Defendants' violation of the Donnelly Act, GM is entitled to recover threefold the damages sustained pursuant to New York General Business Law § 340(5). GM is also entitled to recover costs and reasonable attorneys' fees, pursuant to New York General Business Law § 340(5).

159.     The conduct of Defendants and their co-conspirators constitutes a per se violation of New York General Business Law § 340(1).

## C.  <u>THIRD CLAIM FOR RELIEF AGAINST NYK LINE:<br>BREACH OF CONTRACT</u>

160.     GM incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

161.     During and after the Conspiracy Period, GM and NYK Line entered into multiple service contracts and amendments thereto for Vehicle Carrier Services by which NYK Line agreed to provide Vehicle Carrier Services to GM, and GM agreed to pay NYK Line a price negotiated by GM and NYK Line.  Such contracts include, *inter alia*:

    a.  GM's Global Ocean Transportation Service Contract for RoRo (Roll On Roll Off) Shipments with NYK Line, effective January 1, 2009, and the amendments thereto, including those effective on August 1, 2009 and November 1, 2009; and

    b.  GM's Global Ocean Transportation Service Contract for RoRo (Roll On Roll Off) Shipments with NYK Line, effective February 1, 2011, and the amendments thereto, including those effective on December 1, 2011.

162.     Pursuant to each contract with GM, NYK Line agreed to comply with all applicable laws, rules, regulations, orders, conventions, ordinances, or standards of the countries where services under each contract are provided.

163.     Pursuant to each contract with GM, NYK Line also represented that it would not engage in corrupt business practices in providing Vehicle Carrier Services.

164.     Pursuant to each contract with GM, NYK Line also agreed to keep confidential and not to disclose confidential information such as negotiations, rates, and charges to any present or future competitor.

165.     Pursuant to each contract with GM, NYK Line also agreed to provide Vehicle Carrier Services in an economic manner.

166.     GM has performed all of the obligations, conditions, and agreements required of it pursuant to each contract with NYK Line.  GM paid NYK Line for all Vehicle Carrier Services provided to GM by NYK Line.

167.     As set forth in this Complaint, NYK Line did not comply with the terms of its contracts with GM, including:  (1) the provision requiring compliance with all applicable laws of the countries where services under these contracts are provided; (2) the representation that it would not engage in corrupt business practices in providing Vehicle Carrier Services; (3) the provision requiring it to keep confidential and not to disclose confidential information to any present or future competitor; and (4) the provision requiring it to provide Vehicle Carrier Services in an economic manner.  NYK Line, by engaging in the anticompetitive conduct alleged herein, and/or by providing GM with Vehicle Carrier Services at prices inflated by that conduct, violated those terms.  Accordingly, NYK Line breached each contract with GM.

168.     As a direct result of NYK Line's breaches of contract, GM has been injured and damaged in its business and property, including by paying supracompetitive prices for Vehicle Carrier Services.  GM is thus entitled to damages in an amount to be determined, and such other relief as may be warranted.

### D.  FOURTH CLAIM FOR RELIEF AGAINST WWL NORWAY: BREACH OF CONTRACT

169.     GM incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

170.     During and after the Conspiracy Period, GM and WWL Norway entered into multiple service contracts and amendments thereto for Vehicle Carrier Services by which WWL Norway agreed to provide Vehicle Carrier Services to GM, and GM agreed to pay WWL Norway a price negotiated by GM and WWL Norway.  Such contracts include, *inter alia*:

> a.  GM's Global Ocean Transportation Service Contract for RoRo (Roll On Roll Off) Shipments with WWL Norway, effective January 1, 2008, and the amendments thereto, including those effective October 1, 2009, November 1, 2009, January 1, 2011, March 4, 2011, November 1, 2011, December 1, 2011, December 27, 2011, March 1, 2012, May 1, 2012, and June 18, 2012.

171.     Pursuant to each contract with GM, WWL Norway agreed to comply with all applicable laws, rules, regulations, orders, conventions, ordinances, or standards of the countries where services under each contract are provided.

172.     Pursuant to each contract with GM, WWL Norway also represented that it would not engage in corrupt business practices in providing Vehicle Carrier Services.

173.     Pursuant to each contract with GM, WWL Norway also agreed to keep confidential and not to disclose confidential information such as negotiations, rates, and charges to any present or future competitor.

174.     Pursuant to each contract with GM, WWL Norway also agreed to provide Vehicle Carrier Services in an economic manner.

175.     GM has performed all of the obligations, conditions, and agreements required of it pursuant to each contract with WWL Norway.  GM paid WWL Norway for all Vehicle Carrier Services provided to GM by WWL Norway.

176.     As set forth in this Complaint, WWL Norway did not comply with the terms of its contracts with GM, including:  (1) the provision requiring compliance with all applicable laws of the countries where services under these contracts are provided; (2) the representation that it would not engage in corrupt business practices in providing Vehicle Carrier Services; (3) the provision requiring it to keep confidential and not to disclose confidential information to any present or future competitor; and (4) the provision requiring it to provide Vehicle Carrier Services in an economic manner.  WWL Norway, by engaging in the anticompetitive conduct alleged herein, and/or by providing GM with Vehicle Carrier Services at prices inflated by that conduct, violated those terms.  Accordingly, WWL Norway breached each contract with GM.

177.     As a direct result of WWL Norway's breaches of contract, GM has been injured and damaged in its business and property.  GM is thus entitled to damages in an amount to be determined, including by paying supracompetitive prices for Vehicle Carrier Services, and such other relief as may be warranted.

### E.  FIFTH CLAIM FOR RELIEF AGAINST EUKOR: BREACH OF CONTRACT

178.     GM incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

179.     During and after the Conspiracy Period, GM and EUKOR entered into multiple service contracts and amendments thereto for Vehicle Carrier Services by which EUKOR agreed to provide Vehicle Carrier Services to GM, and GM agreed to pay EUKOR a price negotiated by GM and EUKOR.  Such contracts include, *inter alia*:

      a.  GM's Global Ocean Transportation Service Contract for RoRo (Roll On Roll Off) Shipments with EUKOR, effective December 1, 2009, and the amendments thereto;

      b.  GM's Global Ocean Transportation Service Contract for RoRo (Roll On Roll Off) Shipments with EUKOR, effective January 1, 2011, and the amendments thereto,

including those effective January 1, 2011, October 1, 2011, March 1, 2012, and July 1, 2012.

180.     Pursuant to each contract with GM, EUKOR agreed to comply with all applicable laws, rules, regulations, orders, conventions, ordinances, or standards of the countries where services under each contract are provided.

181.     Pursuant to each contract with GM, EUKOR also represented that it would not engage in corrupt business practices in providing Vehicle Carrier Services.

182.     Pursuant to each contract with GM, EUKOR also agreed to keep confidential and not to disclose confidential information such as negotiations, rates, and charges to any present or future competitor.

183.     Pursuant to each contract with GM, EUKOR also agreed to provide Vehicle Carrier Services in an economic manner.

184.     GM has performed all of the obligations, conditions, and agreements required of it pursuant to each contract with EUKOR.  GM paid EUKOR for all Vehicle Carrier Services provided to GM by EUKOR.

185.     As set forth in this Complaint, EUKOR did not comply with the terms of its contracts with GM, including:  (1) the provision requiring compliance with all applicable laws of the countries where services under these contracts are provided; (2) the representation that it would not engage in corrupt business practices in providing Vehicle Carrier Services; (3) the provision requiring it to keep confidential and not to disclose confidential information to any present or future competitor; and (4) the provision requiring it to provide Vehicle Carrier Services in an economic manner.  EUKOR, by engaging in the anticompetitive conduct alleged herein, and/or by providing GM with Vehicle Carrier Services at prices inflated by that conduct, violated those terms.  Accordingly, EUKOR breached each contract with GM.

186.     As a direct result of EUKOR's breaches of contract, GM has been injured and damaged in its business and property, including by paying supracompetitive prices for Vehicle

Carrier Services.  GM is thus entitled to damages in an amount to be determined, and such other relief as may be warranted.

### F.  SIXTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS: UNJUST ENRICHMENT AND DISGORGEMENT OF PROFITS

187.     GM incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

188.     By charging more for Vehicle Carrier Services than they would have in the absence of Defendants' and their co-conspirators illegal agreement, contract, combination, trust, and/or conspiracy, Defendants have obtained an illegal benefit from GM.

189.     As a result of Defendants' and their co-conspirators illegal agreement, contract, combination, trust, and/or conspiracy, Defendants were able to overcharge GM for Vehicle Carrier Services, resulting in overpayments by GM for Vehicle Carrier Services.

190.     Defendants thus benefitted illegally at GM's expense.  Their retention of these monies violates the fundamental principles of equity and good conscience.  Defendants should be required to disgorge to GM the amount of that unjust enrichment at least in the amount in excess of the reasonable value GM would have paid for Vehicle Carrier Services in the absence of Defendants' and their co-conspirators' illegal agreement, contract, combination, trust, and/or conspiracy.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, GM requests that:

A.     The Court adjudge and decree that the acts of the Defendants and their co-conspirators are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been:

1.     A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief; and

        2.        An unreasonable restraint of trade or commerce in violation of the Donnelly Act, as alleged in the Second Claim for Relief.

B.        That GM recover damages, as provided by federal and New York antitrust laws, and that a judgment be entered in favor of GM against Defendants, jointly and severally, in an amount to be trebled in accordance with such laws;

C.        That GM recover damages and/or all other available monetary remedies pursuant to its claims for breach of contract and unjust enrichment;

D.        That GM be awarded pre- and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.        That GM recover its costs and disbursements of this suit, including reasonable attorneys' fees as provided by law; and

F.        That GM be awarded such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

///

///

///

///

///

///

///

///

///

///

///

///

///

## XIV.   **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, GM demands a jury trial as to all issues triable by a jury.


Dated:  June 15, 2015                           Respectfully submitted,

                                                   *s/ Elizabeth Anne Figueira*
                                                Elizabeth Anne Figueira
                                                CROWELL & MORING LLP
                                                590 Madison Avenue, 20th Floor
                                                New York, New York  10022-2544
                                                Telephone: (212) 223-4000
                                                Facsimile:  (212) 223-4134
                                                E-mail: efigueira@crowell.com

                                                *Pro hac vice applications to be submitted*
                                                *for following attorneys:*

                                                Daniel A. Sasse
                                                Chahira Solh
                                                Ryan C. Wong
                                                CROWELL & MORING LLP
                                                3 Park Plaza, 20th Floor
                                                Irvine, California  92614
                                                Telephone: (949) 263-8400
                                                Facsimile:  (949) 263-8414
                                                E-mail: dsasse@crowell.com
                                                         csolh@crowell.com
                                                         rwong@crowell.com

                                                Kent A. Gardiner
                                                CROWELL & MORING LLP
                                                1001 Pennsylvania Avenue, N.W.
                                                Washington, D.C.  20004
                                                Telephone: (202) 624-2500
                                                Facsimile:  (202) 628-5116
                                                E-mail: kgardiner@crowell.com

                                                *Counsel for Plaintiff General Motors LLC*